EXHIBIT 1

Investigator's report E09-0271

October 7, 2010

Franca Helena Gagliano-McFarland ( Augusta )

v.

Giri Community Drive, LLC dba Holiday Inn - Augusta ( Augusta )

**MAINE HUMAN RIGHTS COMMISSION**

51 STATE HOUSE STATION
AUGUSTA, ME 04333-0051
www.maine.gov/mhrc

*Executive Director*
**PATRICIA E. RYAN**

*Commission Counsel*
**JOHN P. GAUSE**

## I. COMPLAINANT'S CHARGE:

Complainant, Franca Helena Gagliano-McFarland, (hereinafter, Ms. McFarland ), alleged that Respondent, Giri Community Drive, LLC dba Holiday Inn – Augusta (hereinafter, Giri ), terminated her employment because of her pregnancy and physical disability.

## II. RESPONDENT'S ANSWER:

Respondent, Giri Community Drive, LLC dba Holiday Inn – Augusta ( "Giri" ), denied that it engaged in unlawful discrimination. Rather, Giri asserted that Ms. McFarland's termination of employment was based upon her conduct in the workplace, about which she was repeatedly counseled.

## III. JURISDICTIONAL DATA:

1) Date of alleged discrimination: January 23, 2009.

2) Date complaint filed with the Maine Human Rights Commission: June 4, 2009.

3) Respondent employs more than 15 employees and is subject to the Maine Human Rights Act, the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, as amended, as well as state and federal employment regulations.

4) Respondent is represented by Sally Morris, Esq. Complainant is represented by Kristin Aiello, Esq.

5) Investigative methods used: A thorough review of the written materials provided by the parties and an Issues and Resolution conference.

## IV. DEVELOPMENT OF FACTS:

1) The parties and issues in this case are as follows:

   a) The Complainant, Ms. McFarland, is a person living with Erb's Palsy, a substantial disfigurement of her left hand and arm, and scoliosis. As a result of her Erb's Palsy, she cannot use her left hand and arm at all and must work exclusively with her right hand. At the time of her termination, Ms. McFarland was pregnant. She was hired to work for Giri on June 14, 2008 as a Front Desk Clerk.

Investigator's report E09-0271

    b) The Respondent, Giri, is the owner and operator of the Holiday Inn Civic Center.

    c) Important third parties are: CEO/Partner, AS; General Manager, JH; Front Desk Supervisor, IS; Front Desk Clerk 2, A.

2) Ms. McFarland offers the following with regard to her employ with Giri:

    a) "I was very well qualified for the position which I held; I speak several languages and pride myself on my excellent customer service skills. In December of 2008, following a management meeting, I found a note, in Front Desk Supervisor's handwriting which simply said, "not running a charity, get Helena gone." This note was written during a management meeting at which General Manager was present. I couldn't bring myself to talk with Front Desk Supervisor about this note; I was so shocked, I could not utter a word about the thing."

    b) "Subsequently, I received written warnings, all dated December 22, 2008 and issued to me on the same day. In January, 2009, I asked Front Desk Supervisor if my maternity leave would be paid and although he didn't know, he said that he'd get back to me about that. He did get back to me, explaining that the leave would be unpaid and that I should give 1 – 2 weeks' notice as the time approached. The following day, General Manager phoned me at home and requested that I come in to talk on that day. I was unavailable, but agreed to meet with him on the following Monday. On that day, I was presented with a termination letter and was told by General Manager that I was terminated for 'write ups.'"

    c) "I expressed my disagreement with the termination and asked why I was the only one fired for things that others do. Further, I asked about the 'not running a charity' note and General Manager did not answer. After I stated that I wouldn't sign because I disagreed with the termination and the notice, he crossed out some of what he had written on my termination notice, acknowledging that it was wrong. He had written that I checked underage children in and that they had gone up to the room and trashed it. He told me that a Comfort Inn Front Desk Clerk had reported this to him, but it made no sense, because a Comfort Inn Front Desk Clerk would not have known about my actions at a Holiday Inn. He destroyed this warning. He then made a photocopy of the note which stated, 'not running a charity, get Helena gone!'"

3) Ms. McFarland addresses the question of her disability and whether she revealed this to Giri:

    a) "I disclosed my disability, Erb's Palsy and scoliosis, to General Manager and Front Desk Supervisor. I told General Manager about Erb's Palsy during my interview and subsequently talked about the scoliosis, which is a result of Erb's Palsy. Shortly after starting as a Front Desk Clerk, I asked for a stool, with the explanation that standing for long periods of time was painful for me, therefore, I needed to sit at the front desk. General Manager said, "you're not standing on your hand.""

    b) "I explained to General Manager that my back was hurting because I have scoliosis, a condition caused by my Erb's Palsy. While my hand is an obvious disability, my scoliosis is not as immediately obvious, so I explained it to him. My request for accommodation due to

Investigator's report E09-0271

my disability was never granted. I was provided a stool months later, but this was in response to my pregnancy, not my disability."

4) Her customer service skills were unfairly called into question, according to Ms.     McFarland:

a) "In September 2008, I was honored by Giri and chosen as 'Employee of the Month' as a result of being open, friendly and attentive to the inn's guests. There were also many instances of my excellent customer service which were not recognized. I received written recognition from guests, which notices are in my personnel file. In one particular instance, a guest was furious because the inn had lent her an extension cord and she saw a note left by other staff which indicated that the extension cord 'must be retrieved at all cost.' Both General Manager and the Head of Housekeeping recognized me for intervening in this incident. On another occasion, a guest called General Manager to say 'you have an excellent employee here.' General Manager responded 'that's what we want to hear.' These are just a couple of examples, in addition to my ability to speak several languages, including French, which was very helpful to many guests."

b) "Giri provided an undated statement written by Front Desk Clerk 2, a person who I had complained to management about. I had brought Front Desk Clerk 2's lack of professionalism to the attention of General Manager, in particular, Front Desk Clerk 2's tendency to speak with guests about personal matters and to flirt in an obvious manner with guests. In fact, the wife of a regular guest called to request that Front Desk Clerk 2 have no contact with her husband. I suspect that Front Desk Clerk 2's note was in response to my criticism of her flirting with customers. 'We actually helped one another out at the end of busy shifts and General Manager acknowledged that this is accurate.' Giri also criticized me for failing to fill in certain logs on a few occasions, yet other employees did the same and were not disciplined, or subjected to the same degree of scrutiny. I asked General Manager why others were not disciplined, but he did not respond. General Manager denied that I ever complained about these issues, but I believe that this is further evidence of Giri trying to hide their actual motive for my termination and write-ups."

c) "General Manager stated that the flashpoint at which he decided to fire me was in January 2009 when the hotel received a guest survey indicating that a guest had to wait five minutes at the front desk for someone to check him in. The survey was dated December 28, 2008. When presented with this, I explained to General Manager that no guests were present and that I had put up the engraved sign indicating 'desk clerk will be right back.' This sign was designed for that very purpose. I was precisely following hotel procedure when I, sole staff on duty, used the rest room."

5) Giri provided the following during the Issues and Resolution conference:

a) "Ms. McFarland never divulged or discussed the fact that she had scoliosis; she never discussed a disability of any kind, nor did she provide information about her physical condition."

b) "Ms. McFarland mentioned her hand during her employment interview, but General Manager didn't discuss it with her. When Ms. McFarland disclosed her pregnancy, she asked if she could use the executive chair which was in Supervisor's office and readily available, but was told that it would look unprofessional to lean back that way at the front desk, so Giri purchased a stool for her in September, 2008."

Investigator's report E09-0271

    c) "The first 90 days were a period of training and issues were informally discussed with Ms. McFarland."

6) General Manager's affidavit describes performance issues which surfaced during Ms. McFarland's tenure with Giri:

    a) "Ms. McFarland was coached about her communication style which was frequently perceived as being impatient, argumentative and rude. General Manager instructed her to be attentive to her choice of words and her attitude. Also, after the expiration of her trial period, in the fall of 2008, other employees complained about her failure to complete her duties at the front desk."

    b) "On September 1, 2008, a written complaint was made by a guest who approached the front desk for towels and Ms. McFarland was allegedly rude and argumentative about standard rules. She accused the guest of sleeping in and not getting his room made up on time."

    c) "Twice in the winter, Ms. McFarland failed to sign the log book which records the location of the master keys for the hotel."

    d) "On November 24, 2008, Ms. McFarland failed to complete the cash drawer 'bank' log, which is designed to balance and the end of each Front Desk Clerk's shift."

    e) "On December 1 and December 6, 2008, Ms. McFarland did not handle the deposits made into the safe appropriately. Front Desk Clerks kept a log book for the purpose of recording deposits which exceeded a certain dollar amount, which were placed into the safe as witnessed by a co-worker. She was the only Front Desk Clerk who failed to sign the log book at this time."

    f) "On at least three occasions, Ms. McFarland failed to maintain the front desk log which records check-ins, departures and other information which should be noted."

    g) "On November 29, 2008, Ms. McFarland had not adhered to the proper check-in / check-out times. The result for each instance is that the room is lost." ( Giri has not specified whether this was one room or more than one ).

    h) "On December 2, 2008, Ms. McFarland checked a guest in without asking for payment arrangements. The guest was affiliated with a school district, which had no pre-arranged payment system."

    i) "Ms. McFarland violated the rule about using a cell phone at the front desk when guests are waiting for service."

7) Giri asserts that progressive discipline was employed, that Ms. McFarland received the benefit of verbal coaching as well as written warnings and was not terminated until after these other avenues failed to improve her performance.

8) Additional investigation reveals the following:

    a) During her termination meeting with General Manager on January 23, 2009, Ms. McFarland has asserted that General Manager took a copy of the note which stated, "not running a charity, get Helena gone!" During the Issues and Resolution conference, he denied ever seeing the note.

    b) At the Issues and Resolution conference, he also denied that Ms. McFarland ever objected to the written warnings which were all dated December 22, 2008. Ms. McFarland asserts that

she questioned him about how she could be terminated when others did the same; she stated that she told him that she thought that she was being discriminated against.

c) Giri failed to utilize its progressive discipline cycle.

d) Ms. McFarland became pregnant after she was hired.  She disclosed her pregnancy to management around September 2008.  Management remarked that she would have to take maternity leave and from that point on, General Manager and Supervisor repeatedly asked about her leave.  During her pregnancy, Ms. McFarland requested a proper maternity uniform, something more appropriate than the large mens' shirts which she was provided, which simply made her look sloppy and feel uncomfortable in a professional environment. Nothing was provided; her request was simply ignored until just prior to her termination.

## V.     ANALYSIS:

1.  The Maine Human Rights Act requires the Commission to "determine whether there are reasonable grounds to believe that unlawful discrimination has occurred." 5 M.R.S.A. § 4612(1)(B).  The Commission interprets this standard to mean that there is at least an even chance of Complainant prevailing in a civil action.

2.  Complainant, Ms. McFarland, alleged that Respondent, Giri, terminated her employment because of her pregnancy and physical disability.[1]

### Termination - Disability

3.  The Maine Human Rights Act provides, in part, that it is unlawful employment discrimination to discharge an employee because of physical disability. 5 M.R.S.A. § 4572(1)(A).

4.  Because there is no direct evidence of discrimination, the analysis of this case will proceed utilizing the burden-shifting framework following *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  *See Maine Human Rights Comm'n v. City of Auburn*, 408 A.2d 1253, 1263 (Me. 1979).

5.  First, Complainant establishes a prima-facie case of unlawful discrimination by showing that: (1) she belonged to a protected class, (2) she performed her job satisfactorily, (3) her employer took an adverse employment decision against her, and (4) her employer continued to have her duties performed by a comparably qualified person or had a continuing need for the work to be performed. *See Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000); *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 155 (1st Cir. 1990); *cf. City of Auburn*, 408 A.2d at 1261.

6.  The Maine Human Rights Act, 5 M.R.S.A. § 4553-A, defines "physical or mental disability," in relevant part, as follows:

---

[1] The complaint identifies various other bases for discrimination, but Complainant has focused on her termination claim in her January 5, 2010 reply to Respondent's submission. Accordingly, this Analysis will address only her termination claim.

Investigator's report E09-0271

- **Physical or Mental Disability, defined.** Physical or mental disability" means:

A. A physical or mental impairment that:

(1) Substantially limits one or more of a person's major life activities;

(2) Significantly impairs physical or mental health; or

(3) Requires special education, vocational rehabilitation or related services;

B. Without regard to severity unless otherwise indicated: absent, artificial or replacement limbs, hands, feet or vital organs; alcoholism; amyotrophic lateral sclerosis; bipolar disorder; blindness or abnormal vision loss; cancer; cerebral palsy; chronic obstructive pulmonary disease; Crohn's disease; cystic fibrosis; deafness or abnormal hearing loss; diabetes; substantial disfigurement; epilepsy; heart disease; HIV or AIDS; kidney or renal diseases; lupus; major depressive disorder; mastectomy; mental retardation; multiple sclerosis; muscular dystrophy; paralysis; Parkinson's disease; pervasive developmental disorders; rheumatoid arthritis; schizophrenia; and acquired brain injury;

C. With respect to an individual, having a record of any of the conditions in paragraph A or B; or

D. With respect to an individual, being regarded as having or likely to develop any of the conditions in paragraph A or B.

**Additional terms.**   For purposes of this section:

- The existence of a physical or mental disability is determined without regard to the ameliorative effects of mitigating measures such as medication, auxiliary aids or prosthetic devices; and

- "Significantly impairs physical or mental health" means having an actual or expected duration of more than 6 months and impairing health to a significant extent as compared to what is ordinarily experienced in the general population.

7. Once Complainant has established a prima-facie case, Respondent must (to avoid liability) articulate a legitimate, nondiscriminatory reason for the adverse job action. *See Doyle v. Department of Human Services*, 2003 ME 61, ¶ 15, 824 A.2d 48, 54; *City of Auburn*, 408 A.2d at 1262.

8. After Respondent has articulated a nondiscriminatory reason, Complainant must ( to prevail ) demonstrate that the nondiscriminatory reason is pretextual or irrelevant and that unlawful discrimination brought about the adverse employment action. *See id.* Complainant's burden may be met either by the strength of Complainant's evidence of unlawful discriminatory motive or by proof that Respondent's proffered reason should be rejected. *See Cookson v. Brewer School Department*, 2009 ME 57, ¶16; *City of Auburn*, 408 A.2d at 1262, 1267-68. Thus Complainant can meet her overall burden at this stage by showing that (1) the circumstances underlying the employer's articulated reason are untrue, or (2) even if true, those circumstances were not the actual cause of the employment decision. *Cookson v. Brewer School Department*, 2009 ME 57, ¶16.

Investigator's report E09-0271

9. In order to prevail, Complainant must show that she would not have suffered the adverse job action but for membership in the protected class, although protected-class status need not be the only reason for the decision. *See City of Auburn*, 408 A.2d at 1268.

10. Here, Complainant has established a prima-facie case by showing that:

   a. She has a "physical disability" as defined by the MHRA.  Ms. McFarland suffers from Erb's Palsy and scoliosis.

   b. Giri regarded Ms. McFarland as having a disability and she has a record of disability.

   c. Ms. McFarland performed her job satisfactorily, as evidenced by the fact that she received positive feedback, was 'Employee of the Month', and received accolades. She performed her job at an acceptable level.

   d. She suffered an adverse employment action in that Giri terminated her employment.

   e. Giri continued to have the Front Desk Clerk duties performed.

11. Giri offers a non-discriminatory reason for Complainant's termination, namely, performance deficiencies.

12. At the final stage of the analysis, Giri's explanation that Ms. McFarland's employment was terminated for performance deficiencies is not convincing, and there is at least an even chance that Ms. McFarland will be able to prove in court that she would not have been terminated but for her disability, with reasoning as follows:

   a. Giri has shone the light beam on an incident which transpired between she and a hotel guest from New York.  In his angry e-mail, this gentleman referred to his restraint from "leaping down her throat" as she attempted to explain why clean towels were, as a matter of course, delivered during the regular housekeeping cycle. She has stated that she attempted to diffuse his rage by explaining hotel policy, so that this misunderstanding would not be repeated.  She then offered him clean towels and sheets.

   b. There is no evidence which supports Giri's position that she was at fault in this situation.  If she had been rude or inappropriate with a guest, she would have been issued a written warning or perhaps would have been suspended.  This is not what took place.  General Manager simply spoke with her about the exchange.  This incident was not cited in Ms. McFarland's termination paperwork.  Giri issued written warnings which were all dated December 22, 2008; 3 were for incidents of carelessness and one was for disobedience.   Two of the written warnings have, as the 'decision' – an x indicating that they are written warnings.  The other two are indicated to be 'verbal warnings.'  It seems very unlikely that an employer would prepare 4 written warnings, all dated for one particular day, in violation of its own policy for progressive discipline.

Investigator's report E09-0271

    c.  In December of 2008, Complainant found a note in Front Desk Manager's handwriting which simply said, "not running a charity, get Helena gone!" This note was written during a management meeting at which General Manager was present.

    d.  In January of 2009, she asked Front Desk Supervisor if her maternity leave would be paid. He told her that he'd have to get back to her on that. When he did get back to her, he explained that the leave would be unpaid and that she would need to give them 1 – 2 weeks' notice. The following day, General Manager called her at home and requested that she come in to speak with him. Although she was unavailable at that time, she did go in on the following Monday, at which time she was issued 4 written warnings and presented with a letter of termination for "write-ups."

    e.  Ms. McFarland stated that she disagreed with the termination and the disciplinary notice. General Manager then decided to edit one of the written warnings; and destroyed it altogether. He clearly knew that it was absurd to write her up for what a Front Desk Clerk at the Comfort Inn had accused her of.

    f.  Complainant has been credible and consistent in her assertion that she was told by General Manager, "you're not standing on your hand" when she requested the reasonable accommodation of a stool for the Front Desk position, because of back pain. She had explained to both General Manager and Front Desk Supervisor that her scoliosis flowed out of her Erb's Palsy and caused significant discomfort. When the stool was eventually provided, it was due to her pregnancy, not her disability.

    g.  Giri completely ignores the fact that Ms. McFarland was awarded the 'Employee of the Month' honor and that she has written recognition in her personnel file at the Holiday Inn from guests for whom she provided excellent service.

    h.  The fact that Ms. McFarland was chastised for placing the engraved plate on the Front Desk so that she could use the rest room is patently unfair. Any person working alone would need, at some point to utilize the engraved plate. In light of the fact that Ms. McFarland has use of one hand, one needn't wonder why the adjustment of clothing and so on may take longer.

    i.  Giri asserts that the progressive discipline cycle was employed. That is untrue.

    j.  At the Issues and Resolution conference, General Manager stated that he had not seen the handwritten note, in Front Desk Supervisor's hand, which stated, "get Helena gone, not running a charity!" He was not credible.

13. In sum, Giri's stated reasons for terminating Ms. McFarland appear to be a pretext for unlawful disability discrimination.

### Termination - Sex

14. The Maine Human Rights Act provides, in part, that it is unlawful to terminate an employee based on sex (pregnancy). 5 M.R.S.A. §§ 4572(1)(A), 4572-A(1).

Investigator's report E09-0271

15. Because there is no direct evidence of discrimination, the same *McDonnell Douglas*, burden-shifting framework is employed with respect to Complainant's claim that she was terminated because of her sex (preganancy).

16. Here, Ms. McFarland establishes a prima-facie case of discrimination by showing that she was pregnant, she performed her job at an acceptable level, her employment was terminated, and there was still the need for her work to be performed.

17. Giri offers a non-discriminatory reason for Complainant's termination, namely, performance deficiencies.

18. At the final stage of the analysis, Giri's explanation that Ms. McFarland's employment was terminated for performance deficiencies is not convincing, and there is at least an even chance that Ms. McFarland will be able to prove in court that she would not have been terminated but for her sex (pregnancy), with reasoning as follows:

   a. As soon as Complainant made clear the fact that she had become pregnant, managers remarked that she would have to take a maternity leave and made similar comments after that one.

   b. Ms. McFarland asked for a maternity shirt/blouse for months, but that she was ignored. She was forced to wear a huge man's shirt which was unprofessional and ridiculous for a person in a professional environment, who greeted the public. Just prior to being fired, the maternity shirt was provided.

   c. Giri was clearly not pleased by the fact that Ms. McFarland made the request about being allowed to sit at the Front Desk. Giri was also concerned about the fact that Ms. McFarland would be taking a maternity leave at some point. In General Manager's own words, Giri was not "running a charity" and it would be best all around if Ms. McFarland "got gone." A proper way to demonstrate pretext is to demonstrate that discriminatory comments were made by the key decision-maker, who, in this situation, was General Manager. Front Desk Supervisor had made a list during a meeting with General Manager; this comment, was on that list. There was no mystery surrounding who wrote the comment or whose comment it was.

   d. Additionally, the multiple written warnings, all dated December 22, 2008 were written the day after Ms. McFarland was told that she would need to give 1 – 2 weeks' notice prior to going out on maternity leave.

   e. Giri's management at that particular location had a generally hostile attitude toward Ms. McFarland's request for reasonable accommodation, repeatedly inquired about her maternity leave, retaliated against her for requesting both maternity leave and reasonable accommodation, referred to her as a charity case, issued contrived written warnings in violation of their own personnel policy and terminated her employment one day after she inquired about the process for taking a maternity leave.

Investigator's report E09-0271

19. Ms. McFarland has shown that the reasons for her termination were pretextual or irrelevant and that she was terminated due to her pregnancy. Giri fabricated performance concerns to terminate her for her pregnancy.

## VI.   RECOMMENDATION:

For the reasons stated above, it is recommended that the Maine Human Rights Commission issue the following finding:

1) There are **Reasonable Grounds** to believe that the Respondent, Giri Community Drive, LLC, engaged in unlawful employment discrimination (termination) against Complainant, Franca Helena Gagliano-McFarland, because of her disability and her pregnancy.

2) Conciliation should be attempted in accordance with 5 M.R.S.A. § 4612(3).

Patricia E. Ryan, Executive Director

Michèle Dion, Investigator